UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DAVID EASLEY,                                         NO. 05-11290-EFH

      Plaintiff,

      v.

KATHLEEN DENNEHY, et al.,

      Defendants.

<u>MEMORANDUM IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING
ORDER</u>

Without waiver of personal service of process, and pursuant to the June 21, 2005

Order of the Court (Zobel, D.J.), the Superintendent of MCI-Cedar Junction responds to the

plaintiff's motion for a temporary restraining order.

<u>INTRODUCTION</u>

This is a *pro se* action under 42 U.S.C. § 1983 brought by David Easley ("Easley"),

an Ohio State prisoner who been in the custody of the Massachusetts Department of

Correction at MCI-Cedar Junction under the Interstate Corrections Compact (G.L. c. 125

Appendix, § 2-1) since April 26, 2005. Named as defendants are Kathleen Dennehy, the

Commissioner of Correction, and David Nolan, the Superintendent of MCI-Cedar Junction.[1]

Easley alleges that he entered MCI-Cedar Junction during a "riot." He was placed on

suicide watch for cutting his wrist. He alleges that while on suicide watch, he was denied a

blanket. He alleges that he was on constant eyeball watch by "non-trained police" after he

---

[1] The docket sheet indicates other defendants identified by John Brodbeck, John Does 1
through 3, Wayne Belisle, and Erika Grandberg, a University of Massachusetts employee
who serves as the Mental Health Director at MCI-Cedar Junction. None of the defendants
have been served.

again attempted suicide. After mental health staff allegedly denied his demand for Zoloft

and other medications, a blanket and removal from suicide watch, he broke his fiberglass

bed. He alleges that that he is supposed to be in a mental hospital, and that the defendants

are in contempt of a court order entered in <u>Austin v. Wilkinson</u>. He alleges denial of

grievances that University of Massachusetts staff would not respond to his complaints,

including complaints regarding the adequacy of mental health services. Finally, he alleges

that he was wrongly issued disciplinary reports for a suicide attempt, and wrongly denied a

transfer to a psychiatric hospital.

The complaint seeks injunctive relief in the nature of a transfer to a mental facility or

return to Ohio, as well as various declarations plus damages. For the reasons set forth below,

Easley is not entitled to preliminary injunctive relief.

<u>STATEMENT OF FACTS</u>

Since January 1, 2003 the University of Massachusetts Medical School

("UMMS") has been the Department's health services provider under an

interagency service agreement. As provided by the agreement with UMMS and

Department policy, UMMS has "sole responsibility for the entire system of care,

for determining individual inmate needs, and for providing and arranging for care,

within Department of Correction facilities and in the community, directly or

through sub-contractor and linkage arrangements."[2]

---

[2] Affidavit of Greg Hughes, ¶ 2. Greg Hughes is employed by the Massachusetts
Department of Correction as a Regional Administrator for the Health Services Division. He
is a licensed social worker. In his professional capacity, he monitors the provision of mental
health treatment at various state correctional facilities, including MCI-Cedar Junction. The
affidavit is based upon Mr. Hughes' personal knowledge and upon his discussion with other
staff and his review of official records of the Department of Correction. Hughes Affidavit, ¶
1.

UMMS provides comprehensive mental health services to prisoners at MCI-Cedar Junction. Inmates may access mental health services by self-referral or by referral from security staff. Mental health services are provided on site from 8:00 a.m. to 8:00 p.m. Monday through Friday, 8:00 a.m. to 4:00 p.m. on Saturday. At all other times, mental health services are provided on an on-call basis.[3] There is a complement of 6.5 "full time equivalent" mental health staff positions. Erika Grandberg, the UMMS Mental Health Director for MCI-Cedar Junction, is a Licensed Independent Clinical Social Worker. Staff include six mental health professionals and a .5 FTE doctoral-level psychologist. Inmates are seen by mental health clinicians by "self-referral" and by staff referral. MCI-Cedar Junction has an 8 bed Health Services Unit ("HSU"). In the event that mental health staff conclude that the prisoner requires inpatient-level mental health treatment, and that he meets the criteria for involuntary civil commitment, staff will initiate civil commitment to Bridgewater State Hospital, the Department's secure psychiatric hospital, pursuant to G.L. c. 123, § 18. Admission to Bridgewater State Hospital requires the findings that (1) the person is mentally ill; (2) the person is not a proper subject for commitment to any facility of the Department of Mental Health; and (3) the failure to retain the person in strict custody would create a likelihood of serious harm. At the Old Colony Correctional Center, a Level 5 or "high-medium" security facility, there is a unit run as a Residential Treatment Unit ("RTU") for prisoners who need mental health treatment, but do not require in-patient psychiatric hospitalization. The RTU serves "lower functioning" inmates with mental health and mental retardation needs, who have not been able to succeed in general population. Aggressive, higher functioning inmates are not considered for the RTU. Admission to the RTU requires

---

[3] Hughes Affidavit, ¶ 3.

a clinical determination that the individual is appropriate for this unit, as well as a security determination that the individual is appropriate for Level 5 placement.[4]

Mr. Hughes has reviewed the course of Mr. Easley's incarceration at MCI-Cedar Junction.[5] Mr. Easley is an Ohio state prisoner serving sentences for crimes including aggravated (armed) robbery, felonious assault and receiving stolen property. He was incarcerated at the Southern Ohio Correctional Facility in Lucasville. On April 26, 2005, he was admitted to MCI-Cedar Junction under the Interstate Corrections Compact. Records document that Mr. Easley requested his transfer from Ohio to another state, for the stated reason that he felt that he was being retaliated against due to assaulting a staff member. Mr. Easley's Ohio records indicate an extremely disruptive and assault history, with 81 disciplinary reports. These reports include assaulting staff with closed fist punches and biting, threatening to kill and assault staff, numerous physical altercations with other inmates, and destruction of state property (cell sink, sprinkler, cell bed, windows).[6]

Upon arrival, Mr. Easley was provided the standard initial mental health evaluation, conducted by a Licensed Clinical Social Worker.[7] He was seen in the HSU triage room at 3:20 p.m. He claimed to have cut himself with a fork because he was "cold downstairs." However, the clinician did not observe a new cut. He discussed past behaviors and suicide attempts. He reported that he had been receiving the antidepressant Zoloft. It was explained that this medication is not typically prescribed at the Massachusetts Department of Correction. Alternative means of addressing depression are utilized. Asked about suicidal ideations, Mr. Easley reported that "he had a plan," but refused to elaborate. He was advised

---

[4] Id.
[5] Hughes Affidavit, ¶ 4.
[6] Id.
[7] Hughes Affidavit, ¶ 5.

he would be placed on a mental health watch for further evaluation, and he agreed. He discussed mental health services in Ohio. He signed a release form for his records from certain previous providers, but he refused to authorize the release of information from his previous correctional facility. Mr. Easley remained in the Health Services Unit on 15-minute watch status.[8]

At 12:45 p.m. on April 27, 2005, Mr. Easley was seen by another licensed mental health clinician.[9] He reported a history of setting himself on fire and self-injury two days earlier by cutting his arms. He denied suicidal or homicidal ideation. He reported a history of depression and anxiety, and he discussed his disagreement with the mental health watch protocol. He requested to move to population. The clinician noted that Mr. Easley became agitated and provocative, stating that he would act out and be more of a problem on mental health watch. The mental health watch was downgraded to a 30-minute watch.[10] At approximately 1:00 p.m., another mental health clinician evaluated Mr. Easley following a "code 99." Mr. Easley was found on the floor after he had covered his HSU cell window with a blanket. Mr. Easley reported that he had passed out in his HSU cell. He stated that he was "panicky" and did not want to be in the cell. He also asked to speak with the Mental Health Director. He stated he could be in population, and that he wanted to get under his covers and sleep. Mental health watch was upgraded to fifteen minutes. At approximately 5:30 p.m., a LCSW clinician interviewed Mr. Easley and advised him that he would be issued a blanket if he remained calm. He agreed. He also requested that the Mental Health

---

[8] Id.
[9] Hughes Affidavit, ¶ 6.
[10] Id.

Director be informed that he would like to go to the State Hospital. The clinician found no evidence that he needed hospitalization, as he was calm, cooperative, oriented and stable.[11]

At approximately 11:00 a.m. on April 28, a Sergeant observed Mr. Easley break the security bed in his cell, creating pieces of fiberglass.[12] He was removed from the cell and issued a disciplinary report. At 11:30 Mr. Easley was brought to the triage room and interviewed by two LCSW staff members after he tore a hole in his mattress. He stated that he had acted out because he wanted to see the doctor and the mental health director. He stated he should not be at MCI-Cedar Junction and wanted to contact his attorney. He stated that it is illegal for him to be at the facility because it is not a hospital environment. He discussed the ways he knows to engage in self-injurious behavior, how he can escalate, and how he has a diagnosis of an intermittent-explosive disorder. He was seen as cooperative but somewhat argumentative. He was scheduled to be seen by the Deputy and placed on eyeball watch. The clinical assessment was that he may act out for secondary gain.[13] At approximately 11:45 a.m., the Sergeant witnessed Mr. Easley's mattress to be torn, rendering it unusable. Mr. Easley received a disciplinary report. Mr. Easley was seen at 2:30 p.m. by a licensed mental health worker. Dr. Berger Hershkowitz, a psychiatrist, was present. He reported he was not suicidal and did not know why he was on a mental health watch, but if he were suicidal, he'd know which artery to cut. He stated he should be in a treatment facility according to an Ohio court order, and that he was not told he was going to MCI-Cedar Junction. He was assessed as calm, alert, focused, articulate and cooperative.

---

[11] Id.
[12] Hughes Affidavit, ¶ 7.
[13] Id.

His watch was lowered to 15 minutes. He was seen again at 4:15 p.m. and he signed some record releases.[14]

Mr. Easley was seen by a LICSW clinician at approximately 11:00 a.m. on April 29 for assessment of his watch status. The watch was upgraded to 30 minutes. At 9:00 a.m. on April 30, he was seen by a licensed mental health clinician. He reported he wanted to go to population and to call his attorney. He was cleared from watch.[15]

On May 2, 2005, Mr. Easley was transferred from the HSU to Orientation One, a population housing unit. A licensed mental health clinician who evaluated him at 9:25 a.m. prior to the transfer found him calm, alert, focused and cooperative. He reported that he regretted having signed the releases and wanted to know if information was obtained. He asked about medication he was prescribed prior to coming to MCI-Cedar Junction.[16]

Mr. Easley was seen in the Orientation Unit by a licensed mental health clinician on May 4, 2005 at approximately 10:00 a.m. He stated that he was awaiting a psychiatric hospital transfer as promised by Ohio.[17]

At Mr. Easley's request, he was seen at 7:25 p.m. on May 9, 2005 in the HSU crisis office.[18] He reported the Prozac as not helpful and stated that he was on Zoloft and Klonopin in Ohio. He stated that he was transferred from Ohio because of a lawsuit against the previous institution. He reported that he has legal documentation indicating he needs to be in a Residential Treatment Unit ("RTU") or hospital setting where he can participate in group activities. He requested to speak with Deputy Superintendent Mitchell regarding phone

---

[14] Id.
[15] Hughes Affidavit, ¶ 8.
[16] Hughes Affidavit, ¶ 9.
[17] Hughes Affidavit, ¶ 10.
[18] Hughes Affidavit, ¶ 11.

calls. He asked if mental health staff could advocate for him to receive a television and a radio to help with his symptom management and because he had such property in his previous institution. The clinician noted that Mr. Easley needed limit setting because of his asking the clinician for personal property issues.[19]

On May 10, 2005, Mr. Easley submitted a sick call request form, indicating that the nature of the problem was "confidential," but that it concerned "therapeutic music," TV loans and medication.[20] He was seen by a licensed mental health clinician at 2:30 p.m. on May 11, 2005. He requested a television and said he was focusing on living safe and living within DOC policy for earning personal items. He reported he was used to music therapy in his old facility. He made provocative statements "like if I don't get a radio/TV, I may act up." He appeared "smiling and respectful."[21] On May 12, 2005, Mr. Easley submitted a DOC grievance form. He asserted that the case Austin v. Wilkinson requires mental health provided by least restrictive measures. He also alleged the existence of a court order requiring he be in a hospital. He requested transfer to the Old Colony Correctional Center or to Bridgewater State Hospital, pending return to Ohio. The grievance was denied because clinical decisions are not subject to review by the DOC grievance policy.[22]

On May 13, 2005 at approximately 9:05 p.m., a correction officer noticed Mr. Easley tossing books out of his second floor Orientation Unit cell.[23] Upon investigation, the officer noted that Mr. Easley's left arm was bleeding. Mr. Easley was escorted to the HSU. Mental Health staff placed him on a 15 minute-watch. It was noted that he had superficially

---

[19] Id.
[20] Hughes Affidavit, ¶ 12.
[21] Id.
[22] Id.
[23] Hughes Affidavit, ¶ 13.

cut his left arm. He stated that he did this because he was "sick of waiting for a TV or a
radio. I hear voices and the headphones help me to deal with them." He stated that the
voices tell him things like "kill yourself, give up, forget it, be with your Dad, you know,
suicidal thoughts." The clinician discussed the impact of his father's death. He reported he
"wanted to die" when he cut as he reported that he was told he would get a radio soon. He
wanted to return to Ohio. He stated that he was on a recent "Frontline" television program,
and that staff should get a copy of the show if they want to know about him. He reported
that he was not taking his medication, and sometimes he flushes them. Fifteen minute-watch
was continued.[24]

On May 14, 2005, a LCSW clinician saw Mr. Easley. He stated that he became
suicidal because of the lack of television, radio and the kind of intensive mental health
treatment was used to. He discussed he should not be at MCI-Cedar Junction. He discussed
going to a residential treatment unit.[25]

The watch was downgraded to 30 minutes.[26] On May 17, 2005, Mr. Easley was seen
by a mental health clinician. He stated he wanted to see the psychiatrist, that his medications
were not working, that he wanted to make out forms to go to an RTU program, and that he
is going to sue DOC and UMMS. The watch was terminated at approximately 9:20 a.m. He
was returned to Orientation Unit One. At approximately 2:30 p.m. he received a disciplinary
report for refusal to lock in. He had been on the telephone, and told the officer that Deputy
Superintendent Mitchell had approved the call. Security staff referred him to clinical staff
due to his "awaiting action" status. A licensed mental health clinician saw Mr. Easley at

---

[24] Id.
[25] Hughes Affidavit, ¶ 14.
[26] Hughes Affidavit, ¶ 15.

9:00 a.m. on May 18, 2005. He reported increased stress due to his awaiting action status. Security again referred Mr. Easley to clinical staff on May 19, 2005. This was also a self-referral. He asserted increased stress due to the mail system and his current incarceration. Stress management techniques were discussed.[27]

A comprehensive mental health treatment plan was completed on May 25, 2005 during the context of a one-to-one meeting with a licensed mental health clinician.[28] The plan notes Mr. Easley's complaint of not enough mental health services compared to his prior facility, which offered ongoing groups, pet therapy and music therapy. The treatment plan provided one-to-one therapy twice monthly for anger and temper control, mood management and building rapport. Later the same day Mr. Easley was referred to mental health after another inmate flooded the tier, wetting Mr. Easley's property. He was angered that what he characterized as "mental health" inmates were housed with general population inmates.[29]

Mr. Easley filed a grievance with UMMS on May 28, 2005, complaining that he did not have access to an RTU, trained "police" with degrees in psychology to perform suicide watches, treatment programs for manic depression, stress management, music therapy, art therapy and Zoloft. He demanded transfer to a mental facility.[30]

On May 31, 2005, a classification board recommended that Mr. Easley remain at MCI-Cedar Junction due to his disciplinary reports and for continued evaluation. He filed a

---

[27] Id.
[28] Hughes Affidavit, ¶ 16.
[29] Id.
[30] Hughes Affidavit, ¶ 17.

second grievance with UMMS seeking transfer to Bridgewater State Hospital or Old Colony Correctional Center.[31]

Security staff referred Mr. Easley to mental health on June 1, 2005.[32] Mr. Easley reported stressors; having to wait two days to see a psychiatrist, compared with immediate health services he received in Ohio. He was provocative about his history of acting out and his potential for acting out. On June 8, Erika Grandberg, LICSW, the MCI-Cedar Junction Mental Health Director, replied that she had informed him on June 6 that an RTU referral would be submitted to Old Colony Correctional Center in two months, and that transfer to the RTU would depend upon (1) acceptance based upon clinical criteria, and (2) reclassification.[33]

On June 6, 2005, Mr. Easley wrote the Commissioner complaining that he has been denied access to mental health care and Zoloft, and that he has been issued disciplinary reports for suicide attempts. He asserted that he appeared on the May 10, 2005 Frontline. He demanded transfer to an RTU, programs, and money.[34]

On June 10, 2005, Mr. Easley met with a licensed mental health clinician for his bi-weekly one-to-one meeting. He reported walking in the yard, and having received a television and "walkman," which were beneficial to managing his mood.[35]

On June 21, 2005, Mr. Easley was seen by a licensed mental health clinician at approximately 2:00 p.m. after he cut his left wrist with a spoon.[36] He reported that he believes poison is coming through the vents and causes him difficulty breathing. He

---

[31] Hughes Affidavit, ¶ 18.
[32] Hughes Affidavit, ¶ 19.
[33] Id.
[34] Hughes Affidavit, ¶ 20.
[35] Hughes Affidavit, ¶ 21.
[36] Hughes Affidavit, ¶ 22.

appeared to be compliant with his medications during June. His appearance ranged from calm to crying. He remained on the HSU under 15-minute watch status, as he was seen as being at-risk for more self-harm. On June 22, 2005, Mr. Easley was taken to the Lemuel Shattuck Hospital for a dental appointment. A mental health clinician reported him as being calm and respectful, but his mood depressed. He denied suicidal ideation, but was seen as having a potential for self-harm for secondary gain. Mental health watch was downgraded to 30 minutes.[37]

On June 23, 2005, at approximately 8:05 a.m., a correction officer conducting HSU rounds observed Mr. Easley standing on the toilet with his security smock around his neck, attempting to hang himself from the wall vent.[38] Mr. Easley refused orders to cease, but then removed the smock from his neck and stepped off the toilet after an emergency response was begun. Mr. Easley was placed in restraints, examined by medical and mental health staff, then returned to his HSU cell. He was cleared from mental health watch at 4:20 p.m., as he was determined stable at that time.[39]

To date Mr. Easley has proven to be a demanding and challenging inmate for both mental health and correctional personnel. However, that said, his presentation and mental status has not deteriorated to the point where clinical staff have felt an inpatient admission was warranted. His behaviors and mental health needs have been managed and met by the correctional and clinical staff at MCI-Cedar Junction.[40]

---

[37] Id.
[38] Hughes Affidavit, ¶ 23.
[39] Id.
[40] Hughes Affidavit, ¶ 24.

It is clear that Mr. Easley is not happy with his placement at MCI-Cedar Junction, and that it is not what he anticipated when he left Ohio.[41] It also seems clear that he is willing to act out to effect a change in his placement. As clinical staff continue to work with and assess Mr. Easley they will encourage him to more appropriately and effectively express himself and advocate for his needs. A referral to the Residential Treatment Unit is currently being considered and Mr. Easley is aware that prior to placement in such a unit he would need to experience some period of behavioral stability. This is a goal that treatment staff are actively working towards with him.[42]

<u>ARGUMENT</u>

The preliminary injunction standard is familiar. Under it, a district court typically must consider four elements: the probability of the movant's success on the merits, the prospect of irreparable harm absent the injunction, the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does), and the effect of the court's action on the public interest. <u>Matos v. Clinton Sch. Dist.</u>, 367 F.3d 68, 73 (1st Cir. 2004). In this case, Easley cannot satisfy these criteria.

Easley cannot establish a likelihood of success on the merits of his claim. Analysis of Easley's Eighth Amendment claim must begin with the proposition that

> in the medical context...a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious

---

[41] Hughes Affidavit, ¶ 25.
[42] <u>Id</u>.

medical needs. It is only such indifference that can offend evolving standards
of decency in violation of the Eighth Amendment.

Estelle v. Gamble, 429, U.S. 97, 105-06 (1976). "A medical need is 'serious' if it is one that

has been diagnosed by a physician as mandating treatment, or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." Gaudreault

v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990); Dias v. Vose, 885 F.Supp. 53

(D.Mass. 1994), aff'd 50 F.3d 1. For the purpose of this filing, defendants will assume

without conceding a serious medical need.

    The record documents that UMMS mental health staff members have not been

deliberately indifferent to Easley's needs. They have seen Easley on numerous occasions,

providing medication, crisis intervention and therapy. The fact that UMMS mental health

staff provide Easley certain forms of treatment, rather other forms, i.e., civil commitment to

Bridgewater State Hospital or placement in an RTU, does not amount to cruel and unusual

punishment. Id. at 107. An inmate "deserves adequate medical care, [but] he cannot insist

that his institutional host provide him with the most sophisticated care that money can buy."

U.S. v. DeCologero, 821 F.2d 39, 42 (1st Cir. 1987). Disagreements about the quality and

the source of treatment simply do not rise to an Eighth Amendment violation. Ferranti v.

Moran, 618 F.2d 888, 890-891 (1st Cir. 1980); Jackson v. Fair, 846 F.2d 811, 817 (1st Cir.

1988) ("Although the Constitution does require that prisoners be provided with a certain

minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his

choice");[43] Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987); Layne v. Vinzant, 657 F.2d 468, 471 (1st Cir. 1981).

Quite apart from the objective considerations, Easley cannot show that UMMS staff, let alone the Commissioner and the Superintendent, have acted with the subjective state of mind or intent necessary for a "deliberate indifference" claim. The requisite state of mind or intent is similar to criminal recklessness and requires actual knowledge of impending harm which is easily preventable. Dias v. Vose, 885 F.Supp. at 57, citing, Farmer v. Brennan, __ U.S. __, 114 S.Ct. 1970, 1978-1979, (1994). See Desrosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991) (a claim of deliberate indifference requires proof that the defendant had a culpable state of mind and intended wantonly to inflict pain).[44] While state of mind issues generally are not susceptible to summary judgment, "where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was

---

[43] Prisoners like Easley do not have a liberty interest in residing in a psychiatric hospital. See Jackson v. Fair, 846 F.2d at 815-816 (rejecting Massachusetts prisoner's suit seeking rescission of his discharge from Bridgewater State Hospital to a state prison).

[44] Deliberate indifference has been variously formulated by the federal courts to include "reckless disregard", Martin v. White, 742 F.2d 469, 474 (8th Cir. 1984); Layne v. Vinzant, 657 F.2d 468, 471 (1st Cir. 1981), "wanton infliction of pain", Estelle v. Gamble, 429 U.S. at 104, and "gross negligence", Kibbe v. City of Springfield, 777 F.2d 801, 804 (1st Cir. 1985), cert. granted, 475 U.S. 1064 (1986), motion granted, 475 U.S. 1116, cert. dismissed, 480 U.S. 257 (1987). Cf. Voutour v. Vitale, 761 F.2d 812, 820 (1st Cir. 1985), cert. denied, 474 U.S. 1100 (1986). "In order to show 'deliberate indifference', a plaintiff is required to prove that the prison official's action was deliberate or reckless in the criminal sense." Santiago v. Lane, 894 F.2d 218 (7th Cir. 1990). The Supreme Court has cited this criminal reckless standard with approval in Whitley v. Albers, 475 U.S. at 321, 106 S.Ct. at 1085, citing, Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985), cert. denied, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). The First Circuit, also citing Duckworth, has held that the term "deliberate indifference" "encompasses acts or omissions so dangerous (with respect to health or safety) that a defendant's 'knowledge of [a large] ... risk can be inferred.'" Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir 1988). Absent a showing that the prison officials consciously understood that prison conditions created an excessive risk of harm, the conditions are not "punishment" within the meaning of the Eighth Amendment.

intentional or where there is no evidence of acts or omissions so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate." Dias v. Vose, 865 F.Supp at 57, citing Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (granting summary judgment in favor of defendant prison officials in prison suicide case where prison officials had provided inmate with access to mental health services and there was no evidence of acts or omissions so dangerous that knowledge or risk could be inferred). Particularly in this regard, Easley cannot establish the existence of an essential element of his case, because he has not submitted any evidence in the form of competent medical testimony demonstrating that the care being rendered by UMMS is inadequate, let alone conscience-shocking. See Dulaney v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) (in the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel that she received adequate medical treatment). In short, Easley's case amounts to no more than an invitation for the Court to "second guess" the judgment of mental health professionals. Layne v. Vinzant, 657 F.2d at 331. Since his claim of inadequate mental health is founded only on "improbable inferences and unsupported speculation," Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994), the motion for preliminary injunctive relief should be denied.

Even if Easley had produced medical evidence documenting the provision of inadequate care, he has failed to show that the Commissioner and Superintendent have any role in determining what care individual clinicians should provide. The provision of clinical care is a matter of professional judgment. As Judge Aldrich forcefully admonished in a

unanimous opinion reversing a judgment against supervisory prison officials in a suit involving medical care claims,

> we do not see how the Commissioner [of Correction], or the superintendent of a prison as large as those involved here, can be held responsible for the individualized [as opposed to prison-wide] complaints of every prisoner in his charge, except on the basis of actual notice of facts sufficient to put him on inquiry.

Layne v. Vinzant, 657 F.2d at 471 n.3 (citations omitted). The Commissioner and the Superintendent are prison officials, not a medical professionals. As such, they are entitled to rely upon the judgment of medical professionals. Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (because they lacked medical expertise, the prison's treatment director and warden could not be held liable for medical staff's diagnostic decision not to refer prisoner to doctor for treatment of a shoulder injury); McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977).

The facts are undisputed that Easley is receiving ongoing mental health care and management from UMMS mental health staff. In the absence of defendants' direct participation or actual notice to them that Easley is suffering serious harm as a result of constitutionally inadequate mental health care, it is respectfully submitted that this Court cannot properly impose injunctive relief against these officials. For the same reasons, Easley cannot establish that the failure to order the requested preliminary relief would result in irreparable harm to him. To the contrary, an order that be Easley transferred to another facility, or provided with care that his clinicians have not deemed necessary, would cause the Commissioner and the Superintendent irreparable harm by diminishing their authority to place prisoners in the appropriate correctional setting, and it would encourage other

prisoners to act out inappropriately in an attempt to manipulate their own placement and treatment.

## CONCLUSION

Injunctive relief should be denied because (1) Easley has failed to show, by submission of relevant medical evidence, that the treatment offered is inadequate, and (2) neither the Commissioner nor the Superintendent has acted with deliberate indifference.[45]

Dated: June 27, 2005                                    Respectfully submitted,

                                                        NANCY ANKERS WHITE
                                                        Special Assistant Attorney General


                                                        /s/ William D. Saltzman
                                                        William D. Saltzman
                                                        BBO No. 439749
                                                        Department of Correction
                                                        Legal Division
                                                        70 Franklin Street, Suite 600
                                                        Boston, Massachusetts 02110
                                                        (617) 727-3300, Ext. 154


## CERTIFICATE OF SERVICE

I, William D. Saltzman, hereby certify that on this 27th day of June, 2005, I caused a copy of the forging to be served by first class mail, postage prepaid, on the plaintiff, David Easley, to his address, MCI-Cedar Junction, P.O. Box 100, Route 1A, South Walpole, Massachusetts 02071.

                                                        /s/ William D. Saltzman
                                                        William D. Saltzman

---

[45] Only in extreme situations may a court impose liability on correctional officials for the poor medical judgment of clinical professionals. See Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985) (Ignoring clear warnings that the prisoner's medical treatment was inadequate, allowing prisoner to deteriorate beyond recovery, where treatment provided was an extreme example of routinely poor care, may subject officials to liability). This is certainly not the situation at bar.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DAVID EASLEY,                                             NO. 05-11290-EFH

      Plaintiff,

      v.

KATHLEEN DENNEHY, et al.,

      Defendants.

<u>AFFIDAVIT OF GREG HUGHES</u>

I, Greg Hughes, hereby depose and say:

1.      I am employed by the Massachusetts Department of Correction as a Regional Administrator for the Health Services Division. I am a licensed social worker. In my professional capacity, I monitor the provision of mental health treatment at various state correctional facilities, including MCI-Cedar Junction. This affidavit is based upon my personal knowledge and upon my discussion with other staff and my review of official records of the Department of Correction.

2.      Since January 1, 2003 the University of Massachusetts Medical School ("UMMS") has been the Department's health services provider under an interagency service agreement. As provided by the agreement with UMMS and Department policy, UMMS has " sole responsibility for the entire system of care, for determining individual inmate needs, and for providing and arranging for care, within DOC facilities and in the community, directly or through sub-contractor and linkage arrangements."

3.      UMMS provides comprehensive mental health services to prisoners at

MCI-Cedar Junction. Inmates may access mental health services by self-referral or by referral from security staff. Mental health services are provided on site from 8:00 a.m. to 8:00 p.m. Monday through Friday, 8:00 a.m. to 4:00 p.m. on Saturday. At all other times, mental health services are provided on an on-call basis. There is a complement of 6.5 "full time equivalent" mental health staff positions. Erika Grandberg, the UMMS Mental Health Director for MCI-Cedar Junction, is a Licensed Independent Clinical Social Worker. Staff include six mental health professionals and a .5 FTE doctoral-level psychologist. Inmates are seen by mental health clinicians by "self-referral" and by staff referral. MCI-Cedar Junction has an 8 bed Health Services Unit ("HSU"). In the event that mental health staff conclude that the prisoner requires inpatient-level mental health treatment, and that he meets the criteria for involuntary civil commitment, staff will initiate civil commitment to Bridgewater State Hospital, the Department's secure psychiatric hospital, pursuant to G.L. c. 123, § 18. Admission to Bridgewater State Hospital requires the findings that (1) the person is mentally ill; (2) the person is not a proper subject for commitment to any facility of the Department of Mental Health; and (3) the failure to retain the person in strict custody would create a likelihood of serious harm. At the Old Colony Correctional Center, a Level 5 or "high-medium" security facility, there is a unit run as a Residential Treatment Unit ("RTU") for prisoners who need mental health treatment, but do not require in-patient psychiatric hospitalization. The RTU serves "lower functioning" inmates with mental health and mental retardation needs, who have not been able to succeed in general population. Aggressive, higher functioning inmates are not considered for the RTU. Admission to the RTU requires a clinical determination that the individual is appropriate for this unit, as well as a security

determination that the individual is appropriate for Level 5 placement.

4.      I am familiar with the course of Mr. Easley's incarceration at MCI-Cedar Junction. Mr. Easley is an Ohio state prisoner serving sentences for crimes including aggravated (armed) robbery, felonious assault and receiving stolen property. He was incarcerated at the Southern Ohio Correctional Facility in Lucasville. On April 26, 2005, he was admitted to MCI-Cedar Junction under the Interstate Corrections Compact. Records document that Mr. Easley requested his transfer from Ohio to another state, for the stated reason that he felt that he was being retaliated against due to assaulting a staff member. Mr. Easley's Ohio records indicate an extremely disruptive and assault history, with 81 disciplinary reports. These reports include assaulting staff with closed fist punches and biting, threatening to kill and assault staff, numerous physical altercations with other inmates, and destruction of state property (cell sink, sprinkler, cell bed, windows).

5.      Upon arrival, Mr. Easley was provided the standard initial mental health evaluation, conducted by a Licensed Clinical Social Worker. He was seen in the HSU triage room at 3:20 p.m. He claimed to have cut himself with a fork because he was "cold downstairs." However, the clinician did not observe a new cut. He discussed past behaviors and suicide attempts. He reported that he had been receiving the antidepressant Zoloft. It was explained that this medication is not typically prescribed at the Massachusetts Department of Correction. Alternative means of addressing depression are utilized. Asked about suicidal ideations, Mr. Easley reported that "he had a plan," but refused to elaborate. He was advised he would be placed on a mental health watch for further evaluation, and he agreed. He discussed mental health services in Ohio. He signed

a release form for his records from certain previous providers, but he refused to authorize the release of information from his previous correctional facility. Mr. Easley remained in the Health Services Unit on 15-minute watch status.

6.    At 12:45 p.m. on April 27, 2005, Mr. Easley was seen by another licensed mental health clinician. He reported a history of setting himself on fire and self-injury two days earlier by cutting his arms. He denied suicidal or homicidal ideation. He reported a history of depression and anxiety, and he discussed his disagreement with the mental health watch protocol. He requested to move to population. The clinician noted that Mr. Easley became agitated and provocative, stating that he would act out and be more of a problem on mental health watch. The mental health watch was downgraded to a 30-minute watch. At approximately 1:00 p.m., another mental health clinician evaluated Mr. Easley following a "code 99." Mr. Easley was found on the floor after he had covered his HSU cell window with a blanket. Mr. Easley reported that he had passed out in his HSU cell. He stated that he was "panicky" and did not want to be in the cell. He also asked to speak with the Mental Health Director. He stated he could be in population, and that he wanted to get under his covers and sleep. Mental health watch was upgraded to fifteen minutes. At approximately 5:30 p.m., an LCSW interviewed Mr. Easley and advised him that he would be issued a blanket if he remained calm. He agreed. He also requested that the Mental Health Director be informed that he would like to go to the State Hospital. The clinician found no evidence that he needed hospitalization, as he was calm, cooperative, oriented and stable.

7.    At approximately 11:00 a.m. on April 28, a Sergeant observed Mr. Easley break the security bed in his cell, creating pieces of fiberglass. He was removed from the

cell and issued a disciplinary report. At 11:30 Mr. Easley was brought to the triage room

and interviewed by two LCSW staff members after he tore a hole in his mattress. He

stated that he had acted out because he wanted to see the doctor and the mental health

director. He stated he should not be at MCI-Cedar Junction and wanted to contact his

attorney. He stated that it is illegal for him to be at the facility because it is not a hospital

environment. He discussed the ways he knows to engage in self-injurious behavior, how

he can escalate, and how he has a diagnosis of an intermittent-explosive disorder. He was

seen as cooperative but somewhat argumentative. He was scheduled to be seen by the

Deputy and placed on eyeball watch. The clinical assessment was that he may act out for

secondary gain. At approximately 11:45 a.m., the Sergeant witnessed Mr. Easley's

mattress to be torn, rendering it unusable. Mr. Easley received a disciplinary report. Mr.

Easley was seen at 2:30 p.m. by a licensed mental health worker. Dr. Berger

Hershkowitz, a psychiatrist, was present. He reported he was not suicidal and did not

know why he was on a mental health watch, but if he were suicidal, he'd know which

artery to cut. He stated he should be in a treatment facility according to an Ohio court

order, and that he was not told he was going to MCI-Cedar Junction. He was assessed as

calm, alert, focused, articulate and cooperative. His watch was lowered to 15 minutes. He

was seen again at 4:15 p.m. and he signed some record releases.

       8.     Mr. Easley was seen by a LICSW clinician at approximately 11:00 a.m. on

April 29 for assessment of his watch status. The watch was upgraded to 30 minutes. At

9:00 a.m. on April 30, he was seen by a licensed mental health clinician. He reported he

wanted to go to population and to call his attorney. He was cleared from watch.

       9.     On May 2, 2005, Mr. Easley was transferred from the HSU to Orientation

One, a population housing unit. A licensed mental health clinician who evaluated him at 9:25 a.m. prior to the transfer found him calm, alert, focused and cooperative. He reported that he regretted having signed the releases and wanted to know if information was obtained. He asked about medication he was prescribed prior to coming to MCI-Cedar Junction.

10. Mr. Easley was seen in the Orientation Unit by a licensed mental health clinician on May 4, 2005 at approximately 10:00 a.m. He stated that he was awaiting a psychiatric hospital transfer as promised by Ohio.

11. At Mr. Easley's request, he was seen at 7:25 p.m. on May 9, 2005 in the HSU crisis office. He reported the Prozac as not helpful and stated that he was on Zoloft and Klonopin in Ohio. He stated that he was transferred from Ohio because of a lawsuit against the previous institution. He reported that he has legal documentation indicating he needs to be in a Residential Treatment Unit ("RTU") or hospital setting where he can participate in group activities. He requested to speak with Deputy Superintendent Mitchell regarding phone calls. He asked if mental health staff could advocate for him to receive a television and a radio to help with his symptom management and because he had such property in his previous institution. The clinician noted that Mr. Easley needed limit setting because of his asking the clinician for personal property issues.

12. On May 10, 2005, Mr. Easley submitted a sick call request form, indicating that the nature of the problem was "confidential," but that it concerned "therapeutic music," TV loans and medication. He was seen by a licensed mental health clinician at 2:30 p.m. on May 11, 2005. He requested a television and said he was focusing on living safe and living within DOC policy for earning personal items. He

reported he was used to music therapy in his old facility. He made provocative statements "like if I don't get a radio/TV, I may act up." He appeared "smiling and respectful." On May 12, 2005, Mr. Easley submitted a DOC grievance form. He asserted that the case Austin v. Wilkinson requires mental health provided by least restrictive measures. He also alleged the existence of a court order requiring he be in a hospital. He requested transfer to the Old Colony Correctional Center or to Bridgewater State Hospital, pending return to Ohio. The grievance was denied because clinical decisions are not subject to review by the DOC grievance policy.

13.     On May 13, 2005 at approximately 9:05 p.m., a correction officer noticed Mr. Easley tossing books out of his second floor Orientation Unit cell. Upon investigation, the officer noted that Mr. Easley's left arm was bleeding. Mr. Easley was escorted to the HSU. Mental Health staff placed him on a 15 minute-watch. It was noted that he had superficially cut his left arm. He stated that he did this because he was "sick of waiting for a TV or a radio. I hear voices and the headphones help me to deal with them." He stated that the voices tell him things like "kill yourself, give up, forget it, be with your Dad, you know, suicidal thoughts." The clinician discussed the impact of his father's death. He reported he "wanted to die" when he cut as he reported that he was told he would get a radio soon. He wanted to return to Ohio. He stated that he was on a recent "Frontline" television program, and that staff should get a copy of the show if they want to know about him. He reported that he was not taking his medication, and sometimes he flushes them. Fifteen minute-watch was continued.

14.     On May 14, a LCSW clinician saw Mr. Easley. He stated that he became suicidal because of the lack of television, radio and the kind of intensive mental health

treatment was used to. He discussed he should not be at MCI-Cedar Junction. He discussed going to a residential treatment unit.

15.    The watch was downgraded to 30 minutes. On May 17, 2005, Mr. Easley was seen by a mental health clinician. He stated he wanted to see the psychiatrist, that his medications were not working, that he wanted to make out forms to go to an RTU program, and that he is going to sue DOC and UMMS. The watch was terminated at approximately 9:20 a.m. He was returned to Orientation Unit One. At approximately 2:30 p.m. he received a disciplinary report for refusal to lock in. He had been on the telephone, and told the officer that Deputy Superintendent Mitchell had approved the call. Security staff referred him to clinical staff due to his "awaiting action" status. A licensed mental health clinician saw Mr. Easley at 9:00 a.m. on May 18, 2005. He reported increased stress due to his awaiting action status. Security again referred Mr. Easley to clinical staff on May 19, 2005. This was also a self-referral. He asserted increased stress due to the mail system and his current incarceration. Stress management techniques were discussed.

16.    A comprehensive mental health treatment plan was completed on May 25, 2005 during the context of a one-to-one meeting with a licensed mental health clinician. The plan notes Mr. Easley's complaint of not enough mental health services compared to his prior facility, which offered ongoing groups, pet therapy and music therapy. The treatment plan provided one-to-one therapy twice monthly for anger and temper control, mood management and building rapport. Later the same day Mr. Easley was referred to mental health after another inmate flooded the tier, wetting Mr. Easley's property. He was angered that what he characterized as "mental health" inmates were housed with general population inmates.

17.    Mr. Easley filed a grievance with UMMS on May 28, 2005, complaining that he did not have access to an RTU, trained "police" with degrees in psychology to perform suicide watches, treatment programs for manic depression, stress management, music therapy, art therapy and Zoloft. He demanded transfer to a mental facility.

18.    On May 31, 2005, a classification board recommended that Mr. Easley remain at MCI-Cedar Junction due to his disciplinary reports and for continued evaluation. He filed a second grievance with UMMS seeking transfer to Bridgewater State Hospital or Old Colony Correctional Center.

19.    Security staff referred Mr. Easley to mental health on June 1, 2005. Mr. Easley reported stressors; having to wait two days to see a psychiatrist, compared with immediate health services he received in Ohio. He was provocative about his history of acting out and his potential for acting out. On June 8, Erika Grandberg, LICSW, the MCI-Cedar Junction Mental Health Director, replied that she had informed him on June 6 that an RTU referral would be submitted to Old Colony Correctional Center in two months, and that transfer to the RTU would depend upon (1) acceptance based upon clinical criteria, and (2) reclassification.

20.    On June 6, 2005 Mr. Easley wrote the Commissioner complaining that he has been denied access to mental health care and Zoloft, and that he has been issued disciplinary reports for suicide attempts. He asserted that he appeared on the May 10, 2005 Frontline. He demanded transfer to an RTU, programs, and money.

21.    On June 10, 2005 Mr. Easley met with a licensed mental health clinician for his bi-weekly one-to-one meeting. He reported walking in the yard, and having received a television and "walkman," which were beneficial to managing his mood.

22.    On June 21, 2005, Mr. Easley was seen by a licensed mental health clinician at approximately 2:00 p.m. after he cut his left wrist with a spoon. He reported that he believes poison is coming through the vents and causes him difficulty breathing. He appeared to be compliant with his medications during June. His appearance ranged from calm to crying. He remained on the HSU under 15-minute watch status, as he was seen as being at-risk for more self-harm. On June 22, 2005, Mr. Easley was taken to the Lemuel Shattuck Hospital for a dental appointment. A mental health clinician reported him as being calm and respectful, but his mood depressed. He denied suicidal ideation, but was seen as having a potential for self-harm for secondary gain. Mental health watch was downgraded to 30 minutes.

23.    On June 23, 2005 at approximately 8:05 a.m., a correction officer conducting HSU rounds observed Mr. Easley standing on the toilet with his security smock around his neck, attempting to hang himself from the wall vent. Mr. Easley refused orders to cease, but then removed the smock from his neck and stepped off the toilet after an emergency response was begun. Mr. Easley was placed in restraints, examined by medical and mental health staff, then returned to his HSU cell. He was cleared from mental health watch at 4:20 p.m., as he was determined stable at that time.

24.    To date Mr. Easley has proven to be a demanding and challenging inmate for both mental health and correctional personnel. However, that said, his presentation and mental status has not deteriorated to the point where clinical staff have felt an inpatient admission was warranted.  His behaviors and mental health needs have been managed and met by the correctional and clinical staff at MCI-Cedar Junction.

25.    It is clear that Mr. Easley is not happy with his placement at MCI-Cedar

Junction, and that it is not what he anticipated when he left Ohio. It also seems clear that he is willing to act out to effect a change in his placement. As clinical staff continue to work with and assess Mr. Easley, they will encourage him to more appropriately and effectively express himself and advocate for his needs. A referral to the Residential Treatment Unit is currently being considered and Mr. Easley is aware that prior to placement in such a unit he would need to experience some period of behavioral stability. This is a goal which treatment staff are actively working towards with him.

Subscribed under the pains and penalties of perjury this 27th day of June, 2005,


/s/ Greg Hughes
Greg Hughes